## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Melissa L. Cohn,

      Plaintiff,

      v.

Guaranteed Rate Inc., *et al.*,

      Defendants.

Case No. 14 C 9369

Judge John Robert Blakey

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter concerns an employment dispute between Plaintiff Melissa Cohn, her former employer Guaranteed Rate, Inc. ("GRI"), and the President of GRI Victor Ciardelli. Plaintiff's general claim is that she was wrongfully forced out of her position as Executive Vice President of Guaranteed Rate. To that end, Plaintiff alleges four causes of action: (1) declaratory judgment against GRI under 28 U.S.C. §2201(a); (2) breach of contract against GRI; (3) breach of the implied covenant of good faith and fair dealing against GRI; and (4) fraud against Ciardelli. On March 26, 2015, Defendants filed a motion to dismiss Plaintiff's First Amended Complaint ("FAC") in its entirety [20]. That motion is granted in part and denied in part as explained below.

## I.    Background[1]

Prior to October 2012, Melissa Cohn ("Cohn") was the President and sole shareholder of Manhattan Mortgage Co., Inc. ("Manhattan Mortgage"). [19] FAC at

---

[1] The Background Section is based upon the well-pleaded factual allegations of the First Amended Complaint [19] and the related documents properly before this Court. The facts are accepted as true solely for the purpose of this motion.

¶ 5.  In 2012, GRI expressed interest in purchasing Manhattan Mortgage so as to expand its presence in New York and increase its related mortgage business.  *Id*. at ¶6.  To that end, Cohn and Ciardelli conducted negotiations and eventually reached an agreement for GRI to acquire the assets of Manhattan Mortgage and Cohn to work for GRI.  *Id*.  The relevant agreements were memorialized in two documents: (1) the August 20, 2012 Asset Purchase Agreement ("APA"); and (2) the October 1, 2012 Branch Manager Agreement ("BMA").  *Id*. at ¶7.

The APA is the contract by which GRI acquired Manhattan Mortgage's assets.  *Id*. at Ex. B.  It sets out the terms for the asset purchase, including the payment terms and a number of related terms and conditions.  The contract is between only GRI and Manhattan Mortgage.  *Id*.  While several of the contract's clauses contain language relating to Cohn, Cohn is not a party to the contract.  *Id*.  Despite this, there is one section of the APA that may create a limited right for Cohn.  Towards the end of Section IA, there is a paragraph that reads: "in the event that Ms. Cohn's employment is terminated due to Ms. Cohn's death or disability in accordance with the Branch Manager Agreement, all Annual Guarantee amounts due hereunder shall be payable to Ms. Cohn (or Ms. Cohn's legal representative) in accordance herewith."  *Id*. at Ex. B, pg. 2.

The BMA is an agreement between Cohn and GRI that sets out the details of Cohn's employment with GRI.  *Id*. at Ex. A.  It provides for various types of compensation for Cohn's services and explains the scope of her employment duties.  *Id*. at Ex. A, § 2-3. The term of the BMA is indefinite, but it may be terminated by

either party in accordance with its terms. *Id.* at Ex. A, § 2. In Section 3, which sets out the scope of Cohn's employment duties, the BMA reads as follows:

> "GRI agrees that during the term of this Agreement, GRI shall employ Employee as the Executive Vice President of the Manhattan Mortgage Division of GRI. Employee shall perform such duties and exercise such authority in the foregoing capacity as is normally assigned to such an employee of a corporation of the size, stature, and nature of GRI, and shall perform further duties as the Board of Directors of GRI and Chief Executive Officer of GRI may from time to time assign. During the term of this Agreement, Employee shall report directly to the Chief Executive Officer of GRI. Employee understands that the duties expected of her include, without limitation, the following items:"

*Id.* at Ex. A, §3. Section 3 then lists 14 different duties expected of Cohn. *Id.* The BMA is signed by Ciardelli on behalf of GRI, and there is a signature line for Cohn. *Id.* While the version of the contract in the record lacks Cohn's signature, the parties do not dispute that the contract was validly executed. *Id.*

After the BMA and APA were executed, the parties' business relationship deteriorated. *Id.* at ¶12. According to Cohn, this included Defendants preventing her from earning all of the money she was entitled to, undermining her position and authority, constructively discharging her, and later threatening to seek post-employment restrictions. *Id.* In October 2013, Cohn began questioning the computation of her financial package and the lack of information supporting that calculation. *Id.* at ¶13.

Around that same time, Ciardelli began a deliberate pattern of making false statements to Cohn about her job performance and reputation. *Id.* at ¶16. This included blaming Cohn for the departure of GRI's vice presidents and, on November 21, 2013, telling Cohn that he was disappointed in her performance, that she was

responsible for the loss of key employees, and that she was not liked by the mortgage market or her staff. *Id.* at ¶17. During this time, the issue of Cohn's responsibilities remained a contested issue – with Cohn seeking to clarify her role within the company. *Id.* at ¶20. Cohn maintains that her request for clarification did not receive a response. *Id.* at ¶22. Also, from the fall of 2013 until the spring of 2014, Cohn continued to seek information related to the payment she felt she was owed by GRI. *Id.* at ¶23-24.

As a result of Cohn's efforts, GRI informed her in March 2014 that she could receive a portion of the bonus available under the APA known as the "Annual Guaranty." *Id.* at ¶27. According to Cohn, however, GRI required her to sign a Confidential Agreement and General Release (the "Release") in order to receive that bonus money. *Id.* The Release Cohn signed was between herself and GRI. *Id.* Cohn signed the Release on March 18, 2014, but it is unclear who signed on behalf of GRI. *Id.* at ¶27-28, Ex. H.

On the first page of the Release, a recital explains, at least in part, the parties' motivation for entering into the agreement. *Id.* It reads: "The Company [GRI] strongly desires for Cohn's employment with the Company to continue and, has therefore, worked with Cohn to develop a management structure within the Branch to help Cohn succeed as an employee and a regional manager in the organization." *Id.* The Release also absolves GRI from liability for any improper conduct prior to that point in time, stating: "Cohn hereby fully, finally and unconditionally releases, compromises, waive[s] and forever discharge[s]

Guaranteed Rate and the Released Parties from and for any and all claims, allegations, liabilities, lawsuits, personal injuries, demands, debts, liens, damages, costs, grievances, injuries, actions or rights of action of any nature whatsoever." *Id.* at Ex. H, pp. 3-4. The term "Released Parties" is defined to include GRI and its "officers, members, management, agents, attorneys, [and] employees . . . in their individual, fiduciary and corporate capacities." *Id.* at Ex. H, p.4.

Cohn claims that the language in the Release, specifically the recital concerning her continued employment, was "hollow verbiage." *Id.* at ¶30. A few days after Cohn signed the Release, GRI said it would not sign the Release until Cohn signed another agreement – the Compensation and Branch Manager Addendum/Amendment (the "Addendum"). *Id.* The Addendum modified the Release by limiting Cohn's ability to earn future bonuses. *Id.* Cohn executed the Addendum on March 26, 2014, and GRI executed both the Release and the Addendum on March 27, 2014. *Id.* at 31.

In April 2014, GRI allegedly resumed its plan to force Cohn to leave the company by relieving her of all her responsibilities except to originate new business. *Id.* at ¶32. Cohn claims that this violated her rights under the BMA and was done without explanation or justification. *Id.* at ¶33-34. During this time, there were a series of communications between Cohn and GRI regarding her employment status. *Id.* at ¶35-39. Cohn claims that GRI was looking to replace her, and once the company found a suitable replacement it initiated a conference call in which Ciardelli asked Cohn to consider two options: (1) to remain at GRI but with reduced

salary and responsibilities; or (2) to separate from GRI. *Id*. at ¶40. Cohn considered the proposal and, on July 17, 2014, there was another conference call. *Id*. at ¶41. During that call, Cohn told the Defendants she was amendable to pursuing the terms of a separation. *Id*. However, she claims that she did not then, or at any other time, agree to leave GRI voluntarily if no agreement could be reached. *Id*. Discussions between the parties continued throughout July 2014, but were ultimately unsuccessful. *Id*. at ¶42. While the discussions were ongoing, Defendants asked that Cohn not come to the office, and she consented as a sign of good faith. *Id*.

On July 28, 2014, GRI's legal counsel communicated to Cohn's counsel that the parties had to set a final date for Cohn's employment (whether by resignation or termination) because the situation had become disruptive to the company. *Id*. at ¶43. At that time, Cohn was also told not to return to the office because, if she tried to, GRI would bar her access. *Id*. While she did not agree that there was a basis for her exclusion, Cohn decided – on the advice of her counsel – not to press the issue. *Id*. at ¶44.

On July 29, 2014, Cohn's counsel sent a letter to GRI stating that GRI had effectively terminated Cohn without cause by taking the following actions: (1) barring her from the office; (2) excluding her access to support functions; and (3) re-directing her phone calls and messages. *Id*. at ¶45. The letter concluded by saying that Cohn awaited GRI's decision as to the final date of her employment. *Id*. at ¶46. GRI ignored Cohn's request to consensually set a final date of employment, so

Cohn's counsel sent a letter to GRI on August 4, 2014 that stated: "due to GRI's actions my clients [sic] last day of employment with GRI will be this Friday, August 8, 2014." *Id*. at 47. Cohn explained her decision by claiming that, because "of GRI's breach of the parties' contractual agreements and constructive discharge of Cohn without cause, August 8, 2014 was Cohn's final date of employment with GRI." *Id*. at 48.

On August 15, 2014, Cohn's counsel sent a letter to GRI demanding payment for compensation Cohn was due as a result of being terminated without cause. *Id*. at ¶49. GRI refused, and threatened to enforce post-employment restrictions against Cohn. *Id*. at ¶50. Even after Cohn began new employment, GRI continued to allege that she was subject to ongoing restrictions and limitations in her new employment based on the BMA. *Id*. at ¶51. This included an October 9, 2014 letter from GRI to the President of Cohn's employer at the time – Guard Hill Financial Corporation ("Guard Hill"). *Id*. at ¶52. That letter concluded with the following statement: "Guard Hill is now exposed to serious liability as a result of the actions of Minardi, Cohn and others . . . Guaranteed Rate will continue its investigation and should further instances of misconduct be discovered, will vigorously pursue all available remedies and may institute legal action without further notice." *Id*. at Ex. N.

After Cohn filed the instant lawsuit, she was terminated by Guard Hill. *Id*. at ¶54. Cohn claims that she was terminated by Guard Hill out of concern that she might be acting in contravention of the non-solicitation provisions invoked by GRI

in its cease and desist letter. *Id*. at ¶54. Cohn claims that the validity or invalidity of that restriction is an actual controversy that requires determination by the Court. *Id*.

## II.    Legal Standard

Under Rule 12(b)(6), the Court must construe the complaint in the light most favorable to the Plaintiff, accept as true all well-pleaded facts and draw reasonable inferences in her favor. *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013); *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). Statements of law, however, need not be accepted as true. *Yeftich*, 722 F.3d at 915. Rule 12(b)(6) limits this Court's consideration to "allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). To survive a motion under Rule 12(b)(6), the complaint must "state a claim to relief that is plausible on its face." *Yeftich*, 722 F.3d at 915. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### III.   Analysis

#### A.   Count I: Declaratory Judgment

Defendants' motion to dismiss is granted with regard to Count I because: (1) there is no actual controversy; and (2) Count I is redundant of the breach of contract claim set forth in Count II.

##### i.  Actual Controversy

The Declaratory Judgment Act, 28 U.S.C. § 2201, "allows federal courts, in their discretion, to render declaratory judgments only where there exists an 'actual controversy.'" *Trippe Mfg. Co. v. Am. Power Conversion Corp.*, 46 F.3d 624, 627 (7th Cir. 1995) (internal citations omitted).  An actual controversy exists when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.*  When a party seeks a declaratory judgment on the basis that litigation against it is forthcoming, that party must be able to show "that the feared lawsuit from the other party is immediate and real, rather than merely speculative."  *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 712 (7th Cir. 2002).  Further, threats of litigation made by the defendant against a third party are not sufficient to show an "actual controversy" between the plaintiff and the defendant.  *See Deutsche Leasing USA, Inc. v. Hamps Enterprises, LLC*, No. 14 C 6112, 2015 WL 536010, at *3 (N.D. Ill. Feb. 6, 2015).

Plaintiff's claim for declaratory judgment fails because she has not pled any facts substantiating the existence of an immediate and real lawsuit threatened

against her. Instead, the attachments to the First Amended Complaint show that any alleged legal action was merely speculative.

In support of her claim for declaratory judgment, Plaintiff relies on the October 9, 2014 letter from GRI's general counsel to the President of Guard Hill, Cohn's former employer. [24] at 2. That letter reads, in pertinent part, "Guaranteed Rate will continue its investigation and **should** further instances of misconduct be discovered, will vigorously pursue all available remedies and **may** institute legal action without further notice." [19] at Ex. N (emphasis added). This letter is insufficient here under the circumstances, because: (1) the threat of litigation is speculative, not immediate or real; and (2) the threat of litigation is directed at Cohn's former employer Guard Hill, not Cohn. *Deutsche Leasing*, 2015 WL 536010, at *3. In light of the foregoing, Plaintiff's claim for declaratory judgment is dismissed with prejudice.

### ii. Duplicative Claims

Even if Plaintiff had successfully alleged an "actual controversy," the Court would nonetheless dismiss Count I as duplicative of Count II. This Court has discretion to decline to hear a declaratory judgment action even if it considers the action justiciable. *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 747 (7th Cir. 1987). In this district, courts commonly exercise that discretion where the claim for declaratory judgment substantially overlaps with Plaintiff's substantive claims. *Vill. of Sugar Grove v. F.D.I.C.*, No. 10 C 3562, 2011 WL 3876935, at *9 (N.D. Ill. Sept. 1, 2011) (collecting cases); *Amari v. Radio Spirits,*

*Inc.*, 219 F. Supp. 2d 942, 944 (N.D. Ill. 2002). Where the "substantive suit would resolve the issues raised by the declaratory judgment action, the declaratory judgment action 'serve[s] no useful purpose.'" *Amari*, 219 F. Supp. 2d at 944.

The claim for declaratory judgment here is duplicative of Plaintiff's breach of contract claim in Count II. Count I seeks a declaration that "Cohn was constructively discharged without cause" and therefore Cohn is not subject to any limitation or restriction on her post-employment activities. [19] at ¶59. Similarly, in Count II, Cohn claims that the Defendants constructively discharged her without cause in breach of the contracts between the parties. *Id.* at ¶66; [24] at 9. Thus, the substantive legal issue, whether Plaintiff was wrongfully discharged, is the same in both Count I and Count II.

Cohn does not contest this fact, but instead argues that the relief requested in Count I is different than the relief requested in Count II, and therefore the claims are not duplicative. Cohn fails, however, to cite any support for this contention. The focus of the Court's analysis is not on the relief requested, but whether the substantive issues that must be decided by the Court are duplicative. *Amari*, 219 F. Supp. 2d at 944. In fact, courts routinely dismiss declaratory judgment claims as duplicative of substantive claims even when the relief requested may differ. *See Frazier v. U.S. Bank Nat. Ass'n*, No. 11 C 8775, 2013 WL 1337263, at *12 (N.D. Ill. Mar. 29, 2013); *F.D.I.C. v. Vann*, No. 11 C 3491, 2013 WL 704478, at *6 (N.D. Ill. Jan. 23, 2013); *Dixie Gas & Food, Inc. v. Shell Oil Co.*, No. 03 C 8210, 2005 WL 1273273, at *7 (N.D. Ill. May 25, 2005).

Further, the difference in relief requested here is immaterial, because the same relief is *available* under both Counts. In other words, if a claim for declaratory relief were proper here (*i.e.*, there was an "actual controversy") that relief could still be requested as part of the breach of contract claim.[2] Practically speaking, this is shown in two ways: (1) Count II requests "such other relief as the Court deems just and equitable," which could include the declaratory relief requested in Count I; and (2) Plaintiff would be able to amend the FAC, if needed, in order to specifically list in Count II the declaratory relief she formerly sought in Count I. In short, because the substantive issues in Counts I and II are duplicative, and any issues regarding requested relief are immaterial, the Court declines to exercise its discretion to hear this claim for declaratory judgment, even if there were an "actual controversy."

### B. Count II: Breach of Contract

Defendants' motion to dismiss Count II is granted in part and denied in part. In the FAC, Plaintiff claims that Defendants breached two separate contracts: (1) the APA between GRI and Manhattan Mortgage; and (2) the BMA between GRI and Cohn. The motion to dismiss Count II is granted with regard to the APA, and denied with regard to the BMA.

---

[2] Declaratory relief may be awarded "whether or not further relief is or could be sought." 28 U.S.C.A. § 2201. As such, if declaratory relief were otherwise appropriate here (*i.e.*, there was an actual controversy), Plaintiff would be permitted to amend her breach of contract claim to seek declaratory relief.

### i. Asset Purchase Agreement

Defendants' motion to dismiss is granted with regard to the APA because Plaintiff was neither a party to the contract nor a third party beneficiary. "Generally, only a party to a contract, or one in privity with a party, may enforce a contract, except that a third party beneficiary may sue for breach of a contract made for his benefit." *Wilde v. First Fed. Sav. & Loan Ass'n of Wilmette*, 480 N.E.2d 1236, 1242 (Ill. App. Ct. 1985). A strong presumption exists that contracting parties intend "that the contract's provisions apply to only them and not third parties." *Martis v. Grinnell Mutual Reinsurance Co.*, 905 N.E.2d 920, 924 (Ill. App. Ct. 2009). "A third party acquires no rights under a contract entered into by others unless *the provision* at issue was intentionally included for the direct benefit of the third party." *Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp.*, 577 N.E.2d 1344, 1352 (Ill. App. Ct. 1991) (emphasis added). That the contracting parties "know, expect, or even intend that others will benefit from their agreement is not enough to overcome the presumption that the contract was intended for the direct benefit of the parties." *Martis*, 905 N.E.2d at 924.

Whether or not someone constitutes a third party beneficiary depends on the intent of the contracting parties, as evidenced by the contract language itself. *See F.H. Paschen/S.N. Nielsen, Inc. v. Burnham Station, L.L.C.*, 865 N.E.2d 228, 235 (Ill. App. Ct. 2007). It must appear from the relevant language that the contract provision at issue was made for the direct, not merely incidental, benefit of the third party. *Gallagher Corp. v. Russ*, 721 N.E.2d 605, 612 (Ill. App. Ct. 1999). To satisfy

this requirement, the "implication that the contract applies to third parties must be so strong as to be practically an express declaration." *Ball Corp. v. Bohlin Bldg. Corp.*, 543 N.E.2d 106, 107 (Ill. App. Ct. 1989). Liability to a third party must "affirmatively appear from the contract's language and from the circumstances surrounding the parties at the time of its execution, and cannot be expanded or enlarged simply because the situation and circumstances justify or demand further or other liability." *Id*. The plaintiff bears the burden of showing that the parties to the contract intended to confer a direct benefit on him. *Martis*, 905 N.E.2d at 924.

Plaintiff here was neither a party to the APA nor a third party beneficiary. The APA specifically states that it is "between Guaranteed Rate, Inc., . . . and The Manhattan Mortgage Co., Inc.," and it has signature blocks for only those parties. [19] at Ex. B. It is apparent from the face of the APA that Cohn is not a party thereto. Recognizing this, Cohn argues that she was instead a "third party beneficiary" of the APA. [24] at 9. That argument is unavailing.

Cohn has not met her burden of showing that contracting parties intended to confer a direct benefit on her. It is settled law that the evidence required to show that the parties to a contract intended to create a third party beneficiary "must be so strong as to be practically an express declaration." *Ball Corp. v. Bohlin Bldg. Corp.*, 543 N.E.2d 106, 107 (Ill. App. Ct. 1989). There is no such express declaration in the APA, and the remaining evidence relied upon by the Plaintiff is insufficient to constitute "practically an express declaration." Cohn relies on two general arguments to claim status as a third party beneficiary: (1) that the contract

contains specific provisions granting her certain express rights; and (2) that because she is the sole owner of Manhattan Mortgage, she was the intended beneficiary of the rights granted to Manhattan Mortgage under the APA. The Court will address each argument in turn.

### 1. Specific Provisions

In her response brief, Plaintiff points to three contractual provisions that purportedly grant her status as a third party beneficiary. The first two provisions highlighted by Plaintiff fail, because Plaintiff has misreads the contract. For example, the Plaintiff argues that "The $4 million purchase price identified in Section 1 A [of the APA] was for the benefit of Cohn," [24] at 10, but the $4 million purchase price identified in Section 1A was to be paid to Manhattan Mortgage, not Cohn. [19] at Ex. B, Section 1A. Likewise, the Plaintiff claims that the "additional bonus payments potentially available through the 'Annual Guarantees' (potentially $3 million) to be earned under the Asset Purchase Agreement would have been enjoyed by Cohn and no one else," [24] at 10, however, the "Annual Guarantees" were payable to Manhattan Mortgage, not Cohn. [19] at Ex. B, Section 1A. Under the actual language of the contract itself, the APA, then, does not provide any express rights to Cohn under those two provisions.[3]

The third provision, however, merits closer attention. Towards the end Section 1A of the APA, there is a paragraph that reads: "in the event that Ms. Cohn's employment is terminated due to Ms. Cohn's death or disability in

---

[3] To the extent Cohn is arguing that, because she was sole owner of Manhattan Mortgage she was the intended beneficiary of those two provisions, that argument is addressed in the following section.

accordance with the Branch Manager Agreement, all Annual Guarantee amounts due hereunder shall be payable to Ms. Cohn (or Ms. Cohn's legal representative) in accordance herewith." [19] at Ex. B, pg. 2. This provision does grant Cohn some rights under the BMA, and would entitle her to third party beneficiary status with regard to this specific provision. Cohn, however, is not suing under this provision, and she is obviously not claiming that she died or became disabled and was thereafter denied payments to which she was entitled. Simply being a third party beneficiary to one provision of an agreement does not allow Cohn to enforce other provisions to which she is not a third party beneficiary. *See Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp.*, 577 N.E.2d 1344, 1352 (Ill.App.1991) ("A third party acquires no rights under a contract entered into by others unless *the provision at issue* was intentionally included for the direct benefit of the third party.") (emphasis added). Here, while Plaintiff stands as a third party beneficiary with respect to the provision set out above, that does not grant her the ability to enforce other rights or duties in the contract which are only between the parties to the contract. *Id.* As such, the presence of this disability clause does not grant Cohn a right to sue generally under all of the provisions of the APA that she seeks to enforce here.

### 2. Status as Sole Owner

Plaintiff next relies on her status as sole owner of Manhattan Mortgage to claim that she was an intended third party beneficiary of the APA. She generally argues that because she, as sole owner, would enjoy all of the benefits conferred on

Manahattan Mortgage by the APA, she is a third party beneficiary. According to Plaintiff, she "was the sole shareholder of Manhattan Mortgage and the only direct beneficiary of the Asset Purchase Agreement." [24] at 9. Status as sole owner of a contracting party, however, is insufficient to confer status as a third party beneficiary.

Courts commonly hold that an individual's sole ownership of one party to a contract is insufficient to confer on that individual status as a third party beneficiary. *See Sharif v. Int'l Dev. Grp. Co.*, 399 F.3d 857, 861 (7th Cir. 2005); *Williams v. Bd. of Educ. of City of Chicago*, 506 F. App'x 517, 519 (7th Cir. 2013). For instance, in *Shreeji Krupa, Inc. v. Leonardi Enterprises*, No. 04 C 7809, 2007 WL 178305, at *1 (N.D. Ill. Jan. 17, 2007), Plaintiffs Shreeji Krupa, Inc. ("SKI") and Shaurin B. Mehta sued the defendants for, among other things, breach of contract. SKI had a lease with the defendants for the use of certain real estate. *Id.* In 2000, that lease was extended for an additional five years and a clause was included allowing either party to cancel the lease with 60 days' notice. *Id.* Shaurin Mehta was the sole shareholder of SKI but he was not a contracting party to the lease at issue. *Id.*

In April 2005, defendants notified SKI that it would terminate the lease within 60 days unless SKI met certain conditions. When SKI did not meet those conditions, defendants terminated the lease. *Id.* at *2. Mehta brought suit against defendants alleging, among other things, breach of the contract. *Id.* at 1. Mehta argued that "as the sole shareholder" of SKI, he was the "intended third-party

beneficiary" of the lease agreement. *Id.* at *3. The court disagreed, explaining that "allowing Mehta, as the sole shareholder of [SKI], to maintain his claim based on an alleged third-party beneficiary status would impermissibly allow Mehta to create a contractual relationship contrary to the corporate form and the rules of agency." *Id.* Even though Mehta had negotiated, signed, performed, and sought to enforce the lease, the court found that he did not have a contractual relationship with the defendants. It therefore granted defendants' motion for summary judgment on all counts, including Mehta's breach of contract claim. *Id.*

As in *Shreeji Krupa*, the Plaintiff here was the sole owner of the contracting party and was also the individual who negotiated, performed and sought to enforce the contract. Similarly, Plaintiff here was the sole individual who would ultimately benefit from many terms of the contract. As in *Shreeji Krupa*, then, the Court here finds that to allow Plaintiff to maintain her claim "based on an alleged third-party beneficiary status would impermissibly allow [her] to create a contractual relationship contrary to the corporate form and the rules of agency." *Id.* at *3. Defendants' motion to dismiss Count II is therefore granted with regard to the APA.

### ii. Branch Manager Agreement

With regard to the BMA, the Court finds that Plaintiff has adequately plead an action for breach of contract. The elements of a breach-of-contract action are: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resultant injury to the

plaintiff." *Mack Indus., Ltd. v. Vill. of Dolton*, 30 N.E.3d 518, 528 (Ill. App. Ct. 2015).  Only the third element is at issue here.

Plaintiff alleges that Defendants breached the BMA by wrongfully reducing her responsibilities and constructively discharging her without cause.  [19] at ¶¶ 60-67.  As an initial matter, the elimination of any single responsibility is not sufficient to state a breach of the BMA with regard to that specific responsibility.  As set out in the BMA, and argued by Defendants, the responsibilities listed in Section 3 of the BMA are not rights to which Plaintiff is entitled, but requirements that Plaintiff must fulfill.  Because the contract does not entitle Plaintiff to those responsibilities, or impose a duty on Defendants to provide those responsibilities, she cannot bring suit for breach of contract based on the elimination of any single responsibility. *See Martusciello v. JDS Homes, Inc.*, 838 N.E.2d 9, 15  (Ill. App. Ct. 2005) ("In stating a claim for breach of contract, only a duty imposed by the terms of the contract can give rise to the breach").

The reduction of Plaintiff's responsibilities as a whole, however, can support her claim that she was constructively discharged in violation of the BMA.[4] Constructive discharge "is not a cause of action in itself; it is a means of proving what is in form a resignation was in fact a discharge.  Thus, it can be invoked to support a variety of tort, contractual or statutory claims."  33 Am. Jur. Proof of Facts 3d 235.  An employer constructively discharges an employee "only if it makes an employee's working conditions so intolerable that the employee is forced into an

_____

[4] Plaintiff's claim for constructive discharge is based on facts alleged to have occurred *after* she signed the Release.  As such, any argument from Defendant regarding the effect of the Release on this claim is meritless.

involuntary resignation." *Flanagan v. Allstate Ins. Co.*, 581 F. Supp. 2d 920, 928 (N.D. Ill. 2008). This can include the reduction of an employee's responsibilities or rank. *Trapkus v. Edstrom's Inc.*, 489 N.E.2d 340, 344 (Ill. App. Ct. 1986).

For instance, in *Trapkus*, Plaintiff sought to rescind his employment contract based on an alleged breach of that contract by his employer. *Id.* at 342. Under the employment contract, plaintiff was entitled to certain payments based on a share of fiscal year profits, but he was not given those payments, and in response, he requested corporate records to determine his exact share of the profits. *Id.* That request was denied, and the plaintiff was subsequently relieved of all his managerial responsibilities and ordered to perform menial tasks. *Id.* The plaintiff thereafter served notice of termination of employment and filed suit. *Id.* He argued that "he was constructively discharged from his employment" by the acts of the defendant. *Id.* at 344.

The court in *Trapkus* found that when "an employee is engaged to fill a particular position in the service of his employment, any reduction of the rank or a material change in the duties of the employee is, in the absence of anything to justify the employer in so acting, a violation of the contract of employment and will form the basis of an action by the employee for breach of contract." *Id.* The court further explained that, if an "employee, *a fortiori* an executive employee, is engaged to fill a particular position, any material change in his duties, or significant reduction in rank, may constitute a breach of his employment agreement." *Id.* As

such, the court held that "plaintiff was warranted in treating the employment contract as having been breached" by the defendant corporation. *Id.*

The facts in this case are analogous to the situation in *Trapkus*. Defendants here agreed to employ Plaintiff in a managerial position, certain duties and responsibilities were expected of Plaintiff in that position, and Plaintiff was entitled to certain payments for her work. [19] at Ex. A. A dispute arose over payment, and Plaintiff requested further information. *Id.* at ¶¶ 13-16. That information was not adequately provided and, over time, Defendants reduced Plaintiff's responsibilities to the point of barring her from the building and withholding a number of the facilities needed by Plaintiff to perform her job. *Id.* at ¶45. As such, Plaintiff eventually resigned. Given the court's finding in *Trapkus* that such actions could constitute constructive discharge, the Court finds that Plaintiff has adequately pled that she was constructively discharged in violation of her employment agreement. Defendants' motion to dismiss Count II is therefore denied with regard to the BMA.

## C.     Count III: Implied Covenant of Good Faith/Fair Dealing

Plaintiff alleges that GRI "breached the implied covenant of good faith and fair dealing," and as a result she was injured. [19] at ¶73. Illinois law, however, does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing. *Voyles v. Sandia Mortgage Corp.*, 751 N.E.2d 1126 (Ill. 2001); *McArdle v. Peoria Sch. Dist. No. 150*, 705 F.3d 751, 755 (7th Cir. 2013). The covenant is only an aid for contract interpretation, not an independent source of

contractual duties or liability itself under Illinois law. *McArdle*, 705 F.3d at 755. As such, Count III is dismissed with prejudice.

## D.     Count IV: Fraud

Defendants' motion to dismiss Count IV is granted, because Plaintiff has failed to plead a false statement by Ciardelli. Notably, the claim of fraud in Count IV is alleged only against Ciardelli, not GRI. [19] at ¶98. To plead a claim for common law fraud in Illinois, a plaintiff must allege: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damage resulting from reliance on the statement. *See, e.g., Connick v. Suzuki Motor Co., Ltd.*, 174 Ill.2d 482, 496-7 (Ill. 1996); *Tricontinental Indus. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007).

### i.  False Statements of material Fact

To plead fraud, Cohn must state "with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The "circumstances constituting fraud" include "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994). There are two sets of misrepresentations at issue here: (1) statements made by Ciardelli prior to the March 18, 2014 release; and (2) statements made in the Release.

## 1. Pre-March 18, 2014 Statements

The only pre-Release false statements specifically alleged in Plaintiff's First Amended Complaint occurred on November 7, 2013, November 21, 2013 and January 15, 2014. [19] at ¶17-23. On November 7, 2013, Plaintiff claims that Ciardelli wrongly blamed her for the departure of GRI's vice presidents. On November 21, 2013, Ciardelli allegedly lied by saying that he was disappointed in Cohn's performance, that Cohn was responsible for the loss of key employees, and that Cohn was not liked by the market or her staff. On January 15, 2014, Charles Bachtell of GRI allegedly made a number of false statements in an email to Cohn. *Id.* at ¶24. Those statements are not specifically spelled out, but are referenced in letter attached to the FAC. *Id.* at Ex. F. All of the misrepresentations noted above, however, are insufficient to state a cause of action for fraud because Plaintiff released GRI and Ciardelli for any and all claims preceding the March 18, 2014 release date.

Indeed, courts routinely enforce such releases, including those barring claims for fraud. *See, e.g., Rakowski v. Lucente*, 104 Ill.2d 317, 323-24 (Ill. 1984) (affirming dismissal based on release); *Hurd v. Wildman, Allen and Dixon*, 303 Ill.App.3d 84, 93-95 (1st Dist. 1999) (same); *Bank of Am. v. First Mut. Bancorp of Ill. Inc.,* No. 09 C 5108, 2010 WL 2653339, at *12 (N.D. Ill. July 1, 2010) (fraud claim barred by release). In this case, the Release includes the following language: "Cohn hereby fully, finally and unconditionally releases, compromises, waive[s] and forever discharge[s] Guaranteed Rate and the Released Parties from and for any and all

claims, allegations, liabilities, lawsuits, personal injuries, demands, debts, liens, damages, costs, grievances, injuries, actions or rights of action of any nature whatsoever." [19] at Ex. H, pp. 3-4. The term "Released Parties" was defined to include Guaranteed Rate and its "officers, members, management, agents, attorneys, [and] employees . . . in their individual, fiduciary and corporate capacities." *Id.* at Ex. H, p.4. As such, no claim for fraud can be brought for statements made prior to March 18, 2014.

### 2. Statement from the Release

The only other statement at issue, and the only statement Plaintiff identified as an actionable false statement in her response brief, is from the Release itself. In paragraph 4 of the Release section entitled "Cohn's Employment," the contract states: "The Company strongly desires for Cohn's employment with the Company to continue and, has therefore, worked with Cohn to develop a management structure within the Branch to help Cohn succeed as an employee and a regional manager in the organization." [19] at Ex. H.

This statement from the Release, without more, cannot serve as the basis for Plaintiff's fraud claim against Ciardelli because Plaintiff has not pled that Ciardelli made that statement. In her response brief, Plaintiff argues:

> "Cohn's fraud claim against Ciardelli can be succinctly summarized as follows. The March 18 Agreement prepared by GRI included the following recitation by GRI: "The Company strongly desires for Cohn's employment with the Company to continue and, has therefore, worked with Cohn to develop a management structure within the Branch to help Cohn succeed as an employee and a regional manager in the organization." (Exhibit H). The Amended Complaint picks up from its execution and then details how notwithstanding the words drafted by

GRI, it embarked on a course of conduct between April and July of 2014, that "relieved [Cohn] of all her responsibilities, except to originate new business"; how Cohn's responsibilities under the Branch Manager Agreement "were unilaterally and wrongfully reduced"; how neither GRI nor Ciardelli ever "provided written explanation or justification for their conduct"; how GRI and Ciardelli were actually, and wrongfully, planning to replace Cohn with a subordinate; how Cohn was told "to step away from her position of authority"; how Ciardelli suggested Cohn consider a consensual separation of the parties' interests even though he had no intent to reach a mutually acceptable agreement; how Cohn was given a final date for employment because a consensual separation agreement had not been reached; how Cohn was told not to return to the office because her access would be barred; how false and inaccurate information was issued in a press release; and how false and inaccurate information was posted on GRI's website." [24] at 12-13.

The only potentially relevant false statement presented by Plaintiff in her response brief, and indeed the only false statement alleged in the FAC to have occurred after the Release, was the statement made by GRI in the Release concerning its "desire for Cohn's employment with the Company to continue." *Id*. at Ex. H. There is nothing in that statement, or in the totality of the Release, that would indicate that the statement was made by Ciardelli. The Release was between Cohn, Manhattan Mortgage and GRI. *Id*. It was signed by Cohn, and there is an unsigned signature block for GRI in the version of the Release attached to the FAC. *Id*. The FAC alleges that GRI later signed the Release, but does not state who from GRI actually signed. *Id*. at ¶31. Nowhere in the FAC or the attached documents is there any allegation that Ciardelli signed the release or made the statement at issue. As such, that allegedly false statement cannot be the basis for a fraud claim against Ciardelli.

Because Plaintiff has failed to specifically plead any actionable false statement by Ciardelli, the Court need not consider any of the other factors, and Count IV is dismissed without prejudice. Plaintiff is given leave to re-plead her fraud claim if she can do so consistent with Rule 11 of the Federal Rules of Civil Procedure, and is further reminded that she must plead each element of her claim with the specificity required by Federal Rule of Civil Procedure 9(b).

## IV. Conclusion

Defendants' motion to dismiss is granted with prejudice as to Counts I and III. The motion to dismiss Count II is granted with prejudice with regard to the APA, but denied with regard to the BMA. Finally, the motion is granted without prejudice as to Count IV.

IT IS SO ORDERED

Dated: September 10, 2015

_____
John Robert Blakey
United States District Judge