IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MELISSA L. COHN, and MANHATTAN MORTGAGE COMPANY, INC., | ) ) ) | |
| Plaintiffs/Counter-Defendants, | ) ) | Case No. 1:14-cv-09369 |
| v. | ) ) | Judge John Robert Blakey |
| GUARANTEED RATE, INC. | ) ) ) | |
| Defendant/Counter-Plaintiff. | ) | |

**PLAINTIFF COHN'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION FOR SANCTIONS AND OTHER RELIEF**

McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444
William D. Wallach, Esq. (pro hac vice)
wwallach@mccarter.com

BARAK FERRAZZANO KIRSCHBAUM
& NAGELBERG, LLP
200 W. Madison Street, Suite 3900
Chicago, Illinois 60606
(312) 984-3100
Michael S. Elvin, Esq.
Michael.elvin@bfkn.com
Jessica L. Heckinger, Esq.
Jessica.heckinger@bfkn.com

1253477.v1

**PRELIMINARY STATEMENT**

Plaintiffs Melissa L. Cohn ("Cohn") and The Manhattan Mortgage Company ("TMMC") respectfully submit this Brief and the accompanying Certification of Melissa L. Cohn in Opposition to Defendant Guaranteed Rate, Inc.'s ("GRI") Motion for Sanctions and Other Relief. No grounds for any form of relief against TMMC were presented by GRI and none should be granted. Nor is there a basis for the imposition of sanctions or other relief against Cohn. She acknowledges it was improper to advise Chris Minardi, an employee she had hired out of college and was concerned about his job prospect if Cohn did not remain at GRI, to delete an email exchange between them. However, the expansive and punitive relief sought by GRI is not warranted with respect to the remaining actions challenged by GRI.

At the time Cohn deleted the subject emails with third-parties from her personal Gmail account in November of 2013, April-June of 2014, and July of 2014, there was not a reasonable foreseeability of litigation between the parties. In March of 2014, the parties had in fact executed a series of modifications to Cohn's employment contract in order to resolve past ambiguities and differences. Both before and after these modifications, Cohn spoke with and was contacted by third-parties about potential employment opportunities. When those discussions did not lead anywhere, Cohn deleted the emails exchanged from her personal Gmail account.

It is important to place these events in their proper context on the timeline here. GRI did not terminate Cohn's employment until August of 2014, and it was not until the end of November of 2014 that Cohn commenced this lawsuit. GRI's Counterclaim was not filed until February of 2016. It is similarly important to note GRI is in possession of the email communications because Cohn's Interrogatory responses specifically identified the third-parties

1253477.v1

she communicated with and this led to their being served with Subpoenas by GRI. The documents GRI then received in response to the Subpoenas revealed the absence of any proprietary information having been conveyed by Cohn. To the contrary, a close examination of the documents supplied to GRI confirms the information in the possession of the third-parties was comprised of (a) Cohn and TMMC's financial numbers, (b) GRI data already available in the public domain, and (c) financial models and information provided to Cohn by the third-parties. There were no improper disclosures made by Cohn and no harm inflicted upon GRI. This is a fact that should not be overlooked in considering the proportionality of any relief the Court may deem is appropriate under all of the facts and circumstances here.

## COUNTERSTATEMENT OF FACTS

A.    Cohn's Communications with Third-Parties

As stated by Cohn in her Certification, she did not delete emails from her Gmail account for the purpose of hiding information from GRI. When she was employed by GRI, it was Cohn's regular practice to periodically delete emails on her GRI account in order to manage the Outlook account and to do the same with respect to LinkedIn messages. Cohn has also acknowledged deleting emails from her personal Gmail account and did so for both the many personal email exchanges and communications with potential employers. The deletions GRI challenges mainly took place once Cohn realized those discussions were not going to lead anywhere and this was at a time when she did not anticipate suing GRI or being sued by GRI.

During Cohn's employment with GRI from October of 2012, until she was terminated by them in August of 2014, she worked in the New York Region. The majority of her communications with GRI's president, Victor Ciardelli in GRI's Chicago headquarters, were

either by telephone or text message because he was not a regular email user. GRI has not produced a single text message between Mr. Ciardelli and Cohn in response to her discovery requests. This was not unexpected because it is consistent with his practice of deleting text messages. Understanding Mr. Ciardelli's practices, Cohn has not challenged GRI's failure to produce them. But, Cohn should not be held to a different or higher standard than GRI's president. Cohn followed a similar practice with her personal Gmail account. It was not her habit to save all of the messages sent and received.

In October of 2012, Cohn sold her former company, TMMC, to GRI and was hired as a Branch Manager in New York. Later in 2013, some issues arose concerning the scope and terms of her employment at GRI. The fact that there were disagreements with GRI was not the same in Cohn's mind as meaning either herself or GRI were on the verge of filing a lawsuit. To the contrary, in March of 2014, GRI and Cohn executed a series of modifications to her Branch Manager Agreement to resolve those differences of opinion and areas of ambiguity. It is important for the Court to recall Cohn's Complaint here was not filed until November 21, 2014. Even this filing was three months after GRI terminated her employment. Litigation did not immediately follow Cohn's employment termination because there were extensive and ongoing discussions seeking to find a way to resolve the situation. These discussions were continuing in October of 2014, as the email chain attached to Cohn's Certification as Exhibit A shows.

At this point, it is necessary to go back to 2013, to place into context Cohn's communications with potential third-party employers and business partners. This is when she was first contacted by companies who knew her and who she knew about potential employment opportunities. There is no mystery as to the nature of these communications because GRI received these documents from the third-parties in response to their Subpoenas. The documents

- 3 -

show Cohn's discussions with these third-parties took place mostly in November of 2013/March of 2015 (CMG), April-June of 2014 (Supreme), and July of 2014 (Luxury). When those discussions did not lead to a position acceptable to her, she deleted the emails. This was months before the lawsuit was filed by Cohn at the end of November 2014. Her later communications with Guard Hill were after her termination by GRI in August of 2014, and Cohn did not save those emails once hired in September of 2014. Guard Hill responded to GRI's Subpoena and as discussed below, GRI does not point to any improper transmission of its information by her to Guard Hill (GRI's Exhibit 14, GH 223, 481). The same is true of Cohn's communications in March of 2015 with CMG (GRI's Exhibit 3, CMG 108, 113, 117).

During Cohn's communications with these third-parties she discussed with them past financial information concerning TMMC. Under the GRI/Cohn Asset Purchase Agreement, she had the right to do so and GRI does not appear to challenge this fact. In these communications, Cohn did not discuss or disclose proprietary GRI information. Nor was she in a position to do so because Cohn did not have full access to GRI's financial records. As part of discovery in this lawsuit, Cohn asked for GRI financial information she did not previously possess and GRI, recognizing this fact, supplied the data as shown by Exhibit B to her Certification.

The information contained within Exhibit 3 to GRI's Brief, at CMG 48-51, which it claims to be an example of proprietary information, was and remains today in the public domain. Attached as Exhibit C to Cohn's Certification are a series of screen shots from a trade publication known as "Scotsman Guide". The first page contains a ranking of company originator information for the year 2012 (the same as in GRI's Exhibit 3, CMG 48-51). Specific GRI information is featured on this page. The second page specifically breaks down the originator information by individuals at various companies, again including GRI. Additional

sample pages for years 2014 and 2015 are also included to show the Court the breadth and detail of the information that continues to be in the public domain. On the final page of Exhibit C, at the top left corner, the words "Submission period" appear. Since 2009, Scotsman has been able to publish the detailed information displayed on its website because companies such as GRI and their employees submit it to Scotsman for publication and bragging rights. GRI and its loan officers then affirmatively broadcast this information to the public through their own press releases. See Exhibit D to the Cohn Certification.

  Cohn did not turn over confidential GRI information as GRI claimed by referring to Exhibit 3 at page CMG24. As the documents within Cohn's Certification Exhibits C page 1 and Exhibit D confirm, the breakdown between original purchases and refinances is a matter of public knowledge. Nor did Cohn ever hear GRI take the position the products it offers or average loan sizes to be confidential. This was information she regularly provided to potential GRI borrowers when she was employed by GRI in order to secure their business. Cohn similarly considered it be a matter of public knowledge within the mortgage brokerage business which lenders companies such as GRI have relations with.

  Lastly, a close reading of the emails within GRI Exhibit 3, CMG 24-45 and CMG 55-58 from November and December of 2013, shows the information being referenced was specific to Cohn and her financial numbers. When those communications began, Cohn offered to bring her laptop to an initial meeting in order to have ready access to those numbers. At that point, Cohn had not provided her financial numbers to CMG. Returning to a review of the documents relied upon by GRI, CMG 55 concerned Cohn's business numbers and her compensation arrangements. CMG 57 summarized the information Cohn had supplied, which was either her numbers or those of her region. And CMG 58 again showed Cohn's compensation information, as did CMG 59.

- 5 -

These were her numbers and her business footprint, not those of GRI. This can be seen by the fact on CMG 59, Illinois is not referred to as a region even though it is where GRI is headquartered and conducts business.

Nor was GRI proprietary information disclosed in connection with Cohn's communications with Supreme Lending in April/May of 2014. Those documents are attached as GRI's Exhibit 8. In fact, some of the emails such as EFI00004 reference financial models Supreme Lending created for Cohn to consider if she started with them. This was also the case as to the information on EFI185. This pricing information came from Supreme Lending (Steven Chou). He was disclosing potential "jumbo investors pricing" and Cohn was not releasing GRI proprietary pricing information.

The final set of emails to be addressed were attached to GRI's Exhibit 14 and involved Guard Hill. These emails were in the September 2014 time period, which was after Cohn's termination from GRI and two months before she filed the Complaint. Cohn was hired by Guard Hill in September of 2014, and she deleted emails in that time period mainly for two reasons. First, there was a lack of trust within Guard Hill towards its owner Alan Rosenbaum and many people were concerned about their private communications by phone or email. Cohn also deleted emails she did not think needed to be retained. An additional fact to bring out concerning Guard Hill that GRI chose not to mention concerns how Cohn's employment with Guard Hill ended. GRI made it seem as if Cohn was fired for wrongful conduct, but the Court should know Guard Hill paid Cohn a six figure severance and GRI received a copy of the separation agreement in response to its Subpoena showing that Cohn did nothing improper at Guard Hill.

- 7 -

B.     Printing of Cohn's Gmail Emails

The next point to address concerns the Gmails Cohn had saved and then printed out for production to GRI. In several discussions with GRI's counsel, he was informed that for those produced emails that indicated "quoted text hidden", nothing was held back. Instead, whatever may have been the "quoted text hidden" did not print out and that is the only reason why it was not supplied. Cohn has nothing else to provide with respect to those emails and she did not take any affirmative steps to prevent such text from printing.

Nor did Cohn selectively choose which downloaded emails to give her attorney for turnover to GRI. All the emails Cohn had saved were supplied. Nor does she have an explanation as to why the numbering on the bottom of the email strings that were printed out and then scanned for production in discovery appeared in the manner they did. Cohn did not add those numbers or remove anything from the printouts.

C.     Chris Minardi Email

The final email issue that needs to be mentioned and acknowledged is Cohn's email to Chris Minardi on June 18, 2014, which is in GRI Exhibit 1, GRICOHN0011185. As stated earlier in this Brief, Cohn acknowledges suggesting that he delete the email exchange should not have happened. Cohn's attempt to protect Minardi is the reason she said so, but it is not offered as an excuse.

Cohn hired Minardi straight out of college and he worked for her for approximately 16 years. Until Cohn left Guard Hill, she was his only boss. Cohn attended Minardi's wedding and socialized with him and his wife as personal friends. When it became clear Cohn was not well liked at GRI by senior management, Minardi got nervous and Cohn reassured him he would have a home. By the time she was fired by GRI in August of 2014, Minardi had a young baby and

was very concerned about his future. Unlike New York City and its numerous mortgage banks, where Minardi worked on Long Island there were very few other job opportunities to choose from. He was therefore very upset that Cohn was no longer in charge of the New York region and unsure about its future leadership and impact on his income. This was the background to the email exchange in June of 2014, where in addition to talking about his family, Cohn discussed with him a possible change for the future.

LEGAL ARGUMENT

GRI IS NOT ENTITLED TO SANCTIONS OR ANY
OTHER RELIEF AGAINST COHN

A.

Before addressing the sanctions aspect of GRI's Motion, there are two related preliminary legal concepts that should be referenced as they concern the lack of proprietary information having been disclosed, as well as GRI's wrongful termination of Cohn.

In Patriot Homes, Inc. v. Forest River Housing, Inc., 512 F.3d 412 (7th Cir. 2007), the Seventh Circuit vacated a preliminary injunction premised in the alleged wrongful disclosure of confidential information. According to the court, the injunction was too broad because it did not specify what conduct was improper and should thus be enjoined. 512 F.3d at 415. This followed from the defendant's successful argument that the plaintiff's alleged confidential information was either "readily ascertainable" or "in the public domain". Id. at 413. In the context of the present lawsuit, the Patriot Homes recognition that there is not a protectable interest over matters in the public domain should be recognized when the Court reviews the communications between Cohn and the third-parties. No confidential information was provided by Cohn as her Certification explained.

The second principle that bears on the relief GRI seeks implicates its wrongful termination of Cohn in August of 2014. In <u>Agrimerica, Incorporated v. Mathes</u>, 199 Ill.App.3d 435, 448 (Ill. Ct. App. 1990), the court recognized there are situations where the employer's termination of the employee renders post-employment covenants unenforceable. While the specific facts in <u>Agrimerica</u> did not support the application of that principle, we maintain the facts of this case do. As the Court was previously shown, GRI embarked upon a course of conduct that prevented Cohn from working and then effectively terminated her without cause. This conduct included, but was not limited to, the following:

1. barring her from the office and stating she will not be allowed to return to the office in order to work.

2. precluding her from effectively performing her work by excluding her from reasonable access to the support functions that are required.

3. instructing her to attest to the GRI prepared on-line forms surrendering her business licenses.

4. issuing a knowingly false and inaccurate press release.

5. posting knowingly false and inaccurate information on the company website.

6. removing public relations references to her from the company website and changing her employment title.

7. conducting an internal conference call during which time knowingly false and inaccurate statements were made, which was then followed by the circulation of an internal group email containing additional falsehoods.

At trial, Cohn intends to prove all of these facts in order for the Court to see why she was not subject to any post-employment limitations on her activities by GRI. Until then, the existence of GRI's wrongful actions needed to be restated for the Court to recognize why Cohn's activities

- 9 -

with Guard Hill violated no obligation or duty to GRI. And as the Court has seen, the majority of the conduct GRI refers to took place months before Cohn was wrongfully terminated.

B.

The legal standards associated with GRI's Motion are well-settled and do not support the relief requested from the Court given the specific facts that exist here, as demonstrated in Cohn's Certification. This conclusion follows from the decisions GRI cited in its Brief.

The court in <u>Jones v. Bremen High School Dist. 228</u>, 2010 WL 2106640 (N.D. Ill. 2010) recounted the considerations applicable when a party does not preserve documents. Magistrate Judge Cox began her overview by noting in order for discovery sanctions to be sought, there must be proof the offending party "could reasonably foresee [the documents] to be material to a potential lawsuit." Opinion at 5 (footnote omitted). She continued by also observing any potential sanctions "'must be proportionate to the circumstances surrounding the failure to comply with discovery.'" <u>Id</u>. (footnote omitted). Judge Cox then listed the following findings that needed to be made before awarding sanctions for spoliation:

1. a duty to preserve the documents.

2. breach of the duty.

3. harm to the other party.

4. the breach was willful or in bad faith.

<u>Id</u>. (footnote omitted). Cohn respectfully maintains none of these factors exist in this case.

As the extensive recitation of the underlying facts contained in the Cohn Certification revealed, she breached no duty because at the time the emails were deleted it was not foreseeable there would be litigation between the parties. Cohn deleted the communications at the end of 2013, and then in the April – July 2014 time period. These actions were taken prior to her

- 10 -

1253477.v1

employment being terminated by GRI and months prior to Cohn filing this lawsuit at the end of November of 2014. It also bears noting that GRI did not file its Counterclaim until February of 2016. Under the circumstances, it cannot be said that "litigation was imminent" and thus a duty to preserve existed. See Haraburda v. Arcelor Mittal USA, Inc., 2011 WL 2600756 (N.D. Ill. 2011) (duty to preserve arises when potential claim is announced); Norman-Nunnery v. Madison Area Technical College, 625 F.3d 422, 429 (7th Cir. 2010) (documents were lost before litigation was imminent). Factors 1 and 2 are not present here.

GRI similarly cannot establish the existence of factor 3 – harm. In her answers to Interrogatories, Cohn identified the third-parties with whom she communicated. Based upon Cohn's disclosures, GRI served all of them with Subpoenas and received responsive documents. We do not mean in any way to make light of the current Motion, but at the same time must emphasize the fact that GRI is in possession of the emails at issue. This is not a scenario where evidence was destroyed and is permanently unavailable. Through its Subpoenas, GRI obtained the emails deleted well in advance of this litigation and GRI was not harmed by Cohn's actions.

Lastly, Cohn's actions should not be viewed as willful or having been done in bad faith. "Evidence is considered to be destroyed in bad faith 'if it is destroyed for the purpose of hiding adverse information.'" American Multi-Cinema, Inc. v. Kanagin, No. 15-C-5791, Dkt. #84 at 4 (N.D. Ill. July 14, 2016) (citations omitted). See also Faas v. Sears, Roebuck & Co., 532 F.3d 633, 644 (7th Cir. 2008) (bad faith does not exist where documents shredded as a regular practice and not to hide adverse information.). The American Multi-Cinema court went on to note bad faith can be inferred "'when the destruction occurred in relation to the destroyer's knowledge that the evidence was relevant to potential litigation.'" Id. at 5 (citation omitted). As we have pointed out several times, at the time Cohn deleted her emails there was no discussion of

- 11 -

litigation or a likelihood of suit being commenced by either herself or GRI. Nor was "adverse information" hidden. Cohn had the right to speak with the third-parties and breached no contractual obligation to GRI in doing so. GRI has no grounds to challenge or complain about the information Cohn discussed with the third-parties.

Cohn's actions, when viewed in both their full context and the documents themselves are properly understood, do not give rise to sanctions. Nor should an adverse inference be drawn because GRI has the actual emails and has seen their content. And there is no basis for dismissing Cohn's Complaint, which is a draconian sanction finding no basis in this record. In Rosenthal Collins Group, LLC v. Trading Technologies, Inc., 2011 WL 722467 (N.D. Ill. 2011), the court engaged in an exhaustive review of the record before ultimately granting the sanction of dismissal with prejudice. The court did so only after finding the plaintiff responsible for "contumacious conduct" arising from misrepresentations to the court, the intentional modification of evidence, and then deleting evidence of this conduct to prevent its disclosure and gain an advantage in the lawsuit. Id. at 4 - 7. In concluding dismissal was justified, the court stated that "less dramatic sanctions" had been ineffective earlier. Id. at 7.

\*       \*       \*

Before GRI presses its current Motion any further it needs to be prepared to explain to the Court why the deletion of messages by its president (which are now gone forever) is any different than Cohn's actions. Cohn did not previously bring a Motion before the Court concerning Mr. Ciardelli's actions because they were part of his regular business practice and in that regard no different than Cohn deleting the messages involved in this Motion. The subject emails have been in GRI's possession for months and they reveal no confidential information

- 12 -

was disclosed by Cohn. She deleted the emails months before she was terminated and well before she filed this lawsuit, and there was no wrongful motive or purpose in doing so.

## CONCLUSION

Accordingly, for the reasons set forth above and in the Cohn Certification, it is respectfully submitted that GRI is not entitled to any form of relief or sanctions against Cohn. In addition, if the Court is inclined to further extend the time for completion of discovery then we ask for a shorter date than the one proposed by GRI.

Dated: November 15, 2016 	 Respectfully Submitted,

MELISSA L. COHN

By:  /s/ William D. Wallach, Esq.
     One of her Attorneys

William D. Wallach, Esq. (*pro hac vice*)
wwallach@mccarter.com
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey  07102
(973) 622-4444

Michael S. Elvin, Esq.
Michael.elvin@bfkn.com
Jessica L. Heckinger, Esq.
Jessica.heckinger@bfkn.com
BARAK FERRAZZANO KIRSCHBAUM
& NAGELBERG, LLP
200 W. Madison Street, Suite 3900
Chicago, Illinois
(312) 984-3100

- 13 -

1253477.v1

- 14 -

**CERTIFICATE OF SERVICE**

      I, William D. Wallach, an attorney, hereby certify that on this 15th day of November, 2016, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the parties of record by operation of the Court's electronic filing system. Parties may access this filing through the Court' system.

                                                            /s/ William D. Wallach
                                                              William D. Wallach

1253477.v1